**In re: INITIAL PUBLIC OFFERING SECURITIES LITIGATION**

**This Document Relates To: All Cases**

**No. 21 MC 92(SAS).**

United States District Court,
S.D. New York.

Dec. 31, 2003.

Melvyn I. Weiss, Robert Wallner, Ariana J. Tadler, Milberg Weiss Bershad Hynes & Lerach LLP, New York City, Stanley Bernstein, Robert Berg, Rebecca Katz, Bernstein Liebhard & Lifshitz, LLP, New York City, for Plaintiffs.

Gandolfo V. DiBlasi, Sullivan & Cromwell, New York City, with Andrew J. Frackman, Brendan J. Dowd, O'Melveny & Myers LLP, New York City, Fraser L. Hunter, Jr., Wilmer, Cutler & Pickering, New York City, for Defendants (Underwriters).

Jack C. Auspitz, Morrison & Foerster LLP, New York City, for Defendants (Issuers).

### OPINION AND ORDER

SCHEINDLIN, District Judge.

In an Opinion and Order dated February 19, 2003, I decided defendants' motions to dismiss,[1] which they now renew in light of a recent Second Circuit case addressing the pleading of loss causation in securities fraud cases. For the reasons that follow, Underwriter defendants' motion for judgment on the pleadings is denied.

## I. BACKGROUND

The allegations in these actions were exhaustively described in the Court's February Opinion, familiarity with which is assumed.[2] In short, plaintiffs allege that defendants defrauded purchasers of securities of 309 technology stocks by manipulating the market for those securities.[3] The Underwriters allegedly required or induced their customers to buy shares of stock in the aftermarket as a condition of receiving initial public offering stock allocations. These prearranged purchases created an artificial market for the securities, and caused plaintiffs to purchase at an inflated price. In addition, the Underwriters allegedly received inflated commissions or other undisclosed compensation in exchange for IPO allocations. This conduct, collectively, gave rise to two claims against the Underwriters: (1) a claim for market manipulation pursuant to section 10(b) of the Securities Exchange Act and Rule 10b–5 thereunder, and (2) a claim for material misstatements and omissions, also under section 10(b) and Rule 10b–5.[4]

## II. LEGAL STANDARD

■ The issue raised here is whether bare allegations that a defendant artificially inflated the price of a security suffice to plead loss causation under a "fraud on the market" theory.[5] This question highlights an important circuit split in the pleading of securities fraud.

### A. Pleading Causation in a Securities Fraud Claim

To maintain a claim for securities fraud, a plaintiff must plead, among other things, both (1) that it relied upon defendant's allegedly fraudulent conduct in purchasing or selling securities, and (ii) that defendant's conduct caused, at least in part, plaintiff's loss.[6] These two elements are

---

**1.** See In re Initial Public Offering Sec. Litig., 241 F.Supp.2d 281 (S.D.N.Y.2003) (the "February Opinion").

**2.** See id. at 308–21.

**3.** This consolidation now includes 310 IPOs. The final IPO, however, was not consolidated into this action until after the motion to dismiss was decided (and, indeed, after the instant motion was fully briefed) and there is not yet a consolidated amended complaint in that case. See Order, In re Rediff.com India Ltd. IPO Sec. Litig., No. 01 Civ. 3020 (S.D.N.Y. Dec. 1, 2003). My holding today, therefore, is confined to the same 309 IPOs that were the subject of the February ruling.

**4.** See 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b–5.

**5.** On a motion for judgment on the pleadings, as in a motion to dismiss, allegations are presumed to be true and all inferences are drawn in plaintiffs' favor. See Rivera v. Heyman, 157 F.3d 101, 103 (2d Cir.1998). The pleading standards generally applicable to motions to dismiss in the securities fraud context are comprehensively described in the February Opinion. See In re Initial Public Offering Sec. Litig., 241 F.Supp.2d at 321–30.

**6.** See Castellano v. Young & Rubicam, Inc., 257 F.3d 171, 179 (2d Cir.2001).

known, respectively, as "transaction causation" and "loss causation."

"Transaction causation is generally understood as reliance."[7] Under settled Supreme Court precedent, a rebuttable presumption of transaction causation may be established under the "fraud on the market" theory, even where a plaintiff was unaware of the fraudulent conduct at the time of the purchase or sale.

> The fraud on the market theory is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business.... Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements.... The causal connection between the defendants' fraud and the plaintiffs' purchase of stock in such a case is no less significant than in a case of direct reliance on misrepresentations.[8]

Pleading the applicability of the fraud on the market theory, therefore, fulfills a plaintiff's transaction causation pleading requirement.

Loss causation, on the other hand, refers to the requirement that a plaintiff demonstrate that the fraudulent scheme caused her loss.[9] In the case of 10b–5 actions for material misstatements or omissions, loss causation generally requires a plaintiff to show that her investments would not have lost value if the facts that defendant misrepresented or omitted had been known.[10]

As noted above, the Supreme Court has explicitly approved the use of the fraud on the market theory to demonstrate transaction causation. More recently, courts have struggled with whether that theory can also be used to demonstrate loss causation. Those courts that have answered this question in the affirmative hold that, "[i]n a fraud-on-the-market case, plaintiffs establish loss causation if they have shown that the price on the date of purchase was inflated because of the misrepresentation."[11] If the plaintiff overpaid for the security because the fraudulent scheme inflated its price, these courts reason, then the discrepancy between the price of the security and its true investment quality are the measure of her loss.[12]

Those courts rejecting the fraud on the market theory as a sufficient allegation of loss causation reason that if a plaintiff purchases a security at an inflated price,

7. *Id.* at 186.

8. *Basic Inc. v. Levinson,* 485 U.S. 224, 241–42, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) (alterations in original) (quoting *Peil v. Speiser,* 806 F.2d 1154, 1160–61 (3d Cir.1986)).

9. *See Marbury Mgmt., Inc. v. Kohn,* 629 F.2d 705, 716–17 (2d Cir.1980) (Meskill, J., dissenting) (noting that "a fundamental principle of causation which has long prevailed under the common law of fraud and which has been applied to comparable claims brought under the federal securities acts ... is, quite simply, that the injury averred must proceed directly from the wrong alleged and must not be attributable to some supervening cause."). In 1995, Congress codified the loss causation requirement in the Private Securities Litigation Reform Act:

> In any private action arising under this chapter, the plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages.

15 U.S.C. § 78u–4(b)(4).

10. *See, e.g., Suez Equity Investors, L.P. v. Toronto–Dominion Bank,* 250 F.3d 87, 96 (2d Cir.2001).

11. *Knapp v. Ernst & Whinney,* 90 F.3d 1431, 1438 (9th Cir.1996) (citation omitted).

12. *See, e.g., Gebhardt v. ConAgra Foods, Inc.,* 335 F.3d 824, 831 (8th Cir.2003) ("Paying more for something than it is worth is damaging.").

she is only damaged if the sale price is not equally inflated.[13] To plead loss causation, therefore, a plaintiff must allege something more than mere price inflation—something that explains the plaintiff's loss. For example, courts have held that a disclosure correcting an earlier misstatement or omission can, coupled with allegations of artificial inflation, suffice to plead loss causation.[14]

The Courts of Appeals are deeply divided on this question. The Eighth and Ninth circuits have recently reaffirmed their holding that allegations of artificial inflation, alone, *are* sufficient.[15] The Third and the Eleventh circuits have held otherwise.[16]

**B. *Suez Equity* and *Emergent Capital***

In *Suez Equity*, the Second Circuit held that plaintiffs could plead causation in securities fraud cases by alleging:

both that [Plaintiffs] would not have entered the transaction but for the misrepresentations [*i.e.*, transaction causation] *and* that the defendants' misrepresentations induced a disparity between the transaction price and the true "investment quality" of the securities at the time of transaction [*i.e.*, loss causation].[17]

Thus, as recently as 2001, this circuit seemed clearly to have joined with the Eighth and Ninth circuits in holding that allegations of artificial inflation, alone, are sufficient to plead transaction causation.

■ Earlier this year, however, the Second Circuit decided *Emergent Capital Investment Management, LLC v. Stonepath Group, Inc.*,[18] which purported to "clarify" the rule of *Suez Equity*.[19] The *Emergent Capital* court held:

We did not mean to suggest in *Suez Equity* that a purchase-time loss allega-

13. *See Semerenko v. Cendant Corp.*, 223 F.3d 165, 185 (3d Cir.2000).

14. *See, e.g., id.* ("[W]e are persuaded that the Class has alleged sufficient facts to show that the alleged misrepresentations proximately caused the claimed loss. The Class contends that it purchased shares of ABI common stock at a price that was inflated due to the alleged misrepresentations, and that it suffered a loss when the truth was made known and the price of ABI common stock returned to its true value.").

15. *See Broudo v. Dura Pharmaceuticals, Inc.*, 339 F.3d 933, 938 (9th Cir.2003) ("loss causation does not require pleading a stock price drop following a corrective disclosure or otherwise. It merely requires pleading that the price at the time of purchase was overstated and sufficient identification of the cause."); *Gebhardt*, 335 F.3d at 831 (holding that, on a fraud-on-the-market theory, allegations that defendant's "misrepresentations inflated the stock's price" sufficed to plead loss causation). *See also Knapp*, 90 F.3d at 1437–38 (9th Cir.1996) ("In a fraud-on-the-market case, plaintiffs establish loss causation if they have shown that the price on the date of

purchase was inflated because of the misrepresentation."); *In re Control Data Corp. Sec. Litig.*, 933 F.2d 616, 619–620 (8th Cir.1991) ("To the extent that the defendant's misrepresentations artificially altered the price of the stock and defrauded the market, causation is presumed.").

16. *See Semerenko*, 223 F.3d 165; *Robbins v. Kroger Properties, Inc.*, 116 F.3d 1441 (11th Cir.1997) (holding, in the context of a motion pursuant to Rule 51(a) of the Federal Rules of Civil Procedure, that a "showing of price inflation, however, does not satisfy the loss causation requirement. Our decisions explicitly require proof of a causal connection between the misrepresentation and the investment's subsequent decline in value.").

17. 250 F.3d at 97–99.

18. 343 F.3d 189 (2d Cir.2003).

19. *Id.* at 198. The word "clarify" passes the straight face test only because the same judge authored both *Suez Equity* and *Emergent Capital*. Had anyone else written *Emergent Capital*, it would have been even more apparent that *Suez Equity* is no longer good law.

tion *alone* could satisfy the loss causation pleading requirement. To the contrary, we emphasized that the plaintiffs had "also adequately alleged a second, related loss . . . ." [T]herefore, we do not think *Suez Equity* undermined our established requirement that securities fraud plaintiffs demonstrate a causal connection between the content of the alleged misstatements or omissions and "the harm actually suffered." [20]

After *Emergent Capital*, this Circuit appears to have switched camps, now siding with the Third and Eleventh circuits.[21] However, because the court took pains to insist that *Suez Equity* is still good law, the sweep of *Emergent Capital* is not entirely clear.

## III. DISCUSSION

It is *now* clear that allegations of artificial inflation, without more, do not suffice to plead loss causation in securities fraud cases involving material misstatements and omissions. In the February Opinion, I found that plaintiffs had sufficiently alleged loss causation, under the rule of

*Suez Equity*, by alleging a scheme that "'had the effect of inflating the price of the Issuer's common stock above the price that would have otherwise prevailed in a fair and open market.'"[22] In light of *Emergent Capital*, Underwriter defendants renew their objections to plaintiffs' allegations of loss causation.[23]

### A. Understanding *Emergent Capital*

The Third Circuit's rationale for its holding in *Semerenko v. Cendant Corp.* sheds light on the reach and meaning of *Emergent Capital*. *Semerenko* involved alleged misrepresentations in connection with a tender offer.[24] The Court held:

Where the value of a security does not actually decline as a result of an alleged misrepresentation, it cannot be said that there is in fact an economic loss attributable to that misrepresentation. In the absence of a correction in the market price, the cost of the alleged misrepresentation is still incorporated into the value of the security and may be recovered at any time simply by reselling the

---

**20.** *Id.* at 198–99 (emphasis in original) (quoting *Suez Equity* ).

**21.** Interestingly, the *Emergent Capital* court made no reference to this circuit split, nor did it cite the opinions of the Third, Eighth, Ninth or Eleventh circuits.

**22.** *In re Initial Public Offering Sec. Litig.*, 241 F.Supp.2d at 378 (quoting Master Allegations ("MA") ¶ 59).

**23.** Plaintiffs argue that their pleadings contain allegations in addition to those of artificial inflation that, collectively, sufficiently plead loss causation. *First*, plaintiffs cite paragraph 120 of the complaint in *In re Cacheflow, Inc. IPO Sec. Litig.*, No. 01 Civ. 5143 (the "Cacheflow Compl."). That paragraph, however, pertains to the Issuer defendants and is wholly conclusory. *Second*, plaintiffs point to a chart showing that the securities at issue here experienced larger losses than oth-

ers that went public at about the same time. *See* MA ¶ 60. Although this is powerful evidence showing a relationship between the *Initial Public Offering Sec. Litig.* IPOs and loss to investors, it does not explain what *caused* the loss. The case law requires loss causation; loss correlation does not suffice.

Plaintiffs also argue that, under the Supreme Court's recent decision in *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002), they should not have to plead causation at all. *Swierkiewicz*, as discussed extensively in the February Opinion, reminded the lower federal courts of the minimal pleading requirements embodied in the Federal Rules of Civil Procedure. *Swierkiewicz*, however, addressed only pleadings under Rule 8. Securities fraud must be pleaded in accordance with the heightened standard of Rule 9.

**24.** 223 F.3d at 169.

security at the inflated price.[25]

In other words, if the artificial inflation is maintained from the buy to the sell, there is no loss. If a customer buys a security at the inflated price of $12 a share and sells it at the inflated price of $2 a share, that customer suffers the same loss as one who buys at the true price of $11 and sells at the true price of $1. The difference between the inflated prices ($2–$12) and the "true" prices ($1–$11) is the same, and the customer suffered the same loss. So long as the amount of inflation is constant, artificial inflation causes no loss for customers who buy *and* sell at inflated prices.

This rationale suggests that inflated stock prices can lead to a loss in one of two ways. *First,* there can be an external correction to the market, such as a corrective disclosure. Once the fraud is revealed, it no longer taints the stock price and the artificial inflation disappears. The result is a sale at true value, causing a loss based on the inflated price at the time of purchase. *Second,* there can be a market correction, where ordinary market forces affect the rate of artificial inflation. If, for example, the normal functioning of the securities market causes the inflationary effect to dissipate over time, a customer who buys and sells at inflated prices will still suffer a loss based on the inflated price at the time of purchase so long as the price was *less* inflated at the time of sale.

*Semerenko* suggests that, in material misstatement and omission cases,[26] a court cannot presume dissipation of the inflationary effect; a plaintiff must explicitly allege a disclosure or some other corrective event. Indeed, *Emergent Capital* is limited to material misstatement and omis-

sion cases: it is a misrepresentation case, and its recitation of the law consistently refers to misstatements, rather than to the more generic "scheme to defraud." Indeed, all of the previously-cited cases discussing the application of the fraud on the market theory to allegations of loss causation (on both sides of the circuit split) were material misstatement and omission cases. Material misstatements and omissions, however, do not cover all of the proscribed activity under Rule 10b–5. Rule 10b–5 makes it unlawful:

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, *or*

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.[27]

Material misstatements and omissions are prohibited by Rule 10b–5(b); Rules 10b–5(a) and (c) apply to what are commonly called "market manipulation" cases.

## B. Market Manipulation Claim

The IPO litigation involves claims of market manipulation. Plaintiffs allege that the banks' laddering of securities created artificial demand in the aftermarket of hot IPOs, thereby artificially inflating the price of those securities. Thus, the question arises: for loss causation pur-

---

**25.** *Id.* at 185.

**26.** As explained in more detail below, securities fraud claims under section 10(b) and Rule 10b–5 may be predicated on either material

misstatements and/or omissions *or* so-called "market manipulation".

**27.** 17 C.F.R. § 240.10b–5(a)—(c).

poses, are market manipulation cases different from misstatement cases?

As noted earlier, the fraud on the market theory is premised on the idea that, in an efficient market, stock prices reflect all the information available to the market.[28] Once a misstatement or omission infects the pool of available information, it continues to affect the stock price until contradictory information becomes available. The inflationary effect of misstatements or omissions, therefore, should be constant.[29]

Manipulative conduct is different. A market manipulation is a discrete act that influences stock price.[30] Once the manipulation ceases, however, the information available to the market is the same as before, and the stock price gradually returns to its true value. For example, suppose that a bank manipulates the market for a stock by engaging in "wash sales," fictitious trading for the purpose of creating a false appearance of activity. By creating an appearance of increased trading volume, wash sales may drive up the price of a security. Once the wash sales cease, ordinary trading resumes. The spectre of wash sales may continue to affect the stock price for some time as investors recall the recent increased activity and observe the higher price; over time, however, the security will fall back to its true investment value.

In market manipulation cases, therefore, it may be permissible to infer that the artificial inflation will inevitably dissipate.[31] That being so, plaintiffs' allegations of artificial inflation are sufficient to plead loss causation because it is fair to infer that the

---

28. *See Basic,* 485 U.S. at 241–42, 108 S.Ct. 978.

29. While the inflationary effect "should be" constant, there may be circumstances where this will not be the case. In the usual case, a misstatement will retain its importance so long as contrary information is not made public. For example, when a company misstates its earnings, the importance of that misstatement should have a continuing effect on the price of the stock. In some cases, however, the importance of misstatements may diminish over time, and the inflationary effect may diminish (or disappear entirely) with it. Absent an explicit allegation, however, *Emergent Capital* stands for the proposition that a court may not infer, on a motion to dismiss, that the inflationary effect will dissipate in misstatement cases.

30. The word "manipulative" is "virtually a term of art when used in connection with securities markets. It connotes intentional or wilful conduct designed to deceive or defraud investors by controlling or artificially affecting the price of securities." *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 199, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). Market manipulation

> refers generally to practices, such as wash sales, matched orders, or rigged prices, that are intended to mislead investors by

artificially affecting market activity.... Section 10(b)'s general prohibition of practices deemed by the SEC to be "manipulative"—in this technical sense of artificially affecting market activity in order to mislead investors—is fully consistent with the fundamental purpose of the 1934 [Securities Exchange] Act....

*Santa Fe Indus., Inc. v. Green,* 430 U.S. 462, 476–77, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977).

31. Indeed, in some market manipulation cases it may be difficult to *allege* loss causation with greater particularity than a bare allegation of artificial inflation.

> Unlike most fraud—most notably misrepresentation claims, where Rule 9(b) has been most heavily commented upon ... market manipulation claims present circumstances in which the mechanism of the scheme is likely to be unknown to the plaintiffs.

*In re Blech Sec. Litig.,* 928 F.Supp. 1279, 1290–91 (S.D.N.Y.1996). If the mechanism of the fraud is a mystery, then the precise cause of the loss may also be unclear. In such a case, it should be sufficient to *allege* artificial inflation—a loss that stems from defendant's manipulative conduct, even if the plaintiff is not precisely sure how the manipulative conduct caused the loss. The particulars may then be obtained in discovery. Proof, of course, is a different issue.

inflationary effect must inevitably diminish over time. It is that dissipation—and not the inflation itself—that caused plaintiffs' loss.

It is important not to lose sight of why loss causation is a requirement of a securities fraud claim. At base, loss causation is nothing more than a securities fraud analog to the tort concept of proximate causation, "meaning that the damages suffered by plaintiff must be a foreseeable consequence of any" scheme to defraud.[32] The gravamen of plaintiffs' complaint is that the Underwriters manipulated the IPO market to drive up the price of securities, knowing that they were causing the securities to be overvalued and that the stock prices would eventually recede to reflect the actual value of the securities, thereby injuring innocent investors. That is loss causation.[33]

### C. Material Misstatement and Omission Claim

For the same reasons that plaintiffs' allegations of artificial inflation plead loss causation in their market manipulation claims, they also plead loss causation in the material misstatement and omission claims. It is true that *Emergent Capital* ordinarily forbids courts from inferring a dissipation in the inflationary effect of misstatements. In this case, however, the misstatements and omissions did nothing more than conceal the Underwriters' alleged market manipulation.[34]

*Emergent Capital* requires allegations of a "causal connection between the content of the alleged misstatements and 'the harm actually suffered.' "[35] The content of Underwriters' misstatements was, in essence: "this is a fair, efficient market, unaffected by manipulation." In fact (according to plaintiffs), the market was manipulated. For the reasons discussed in Part III.B above, that market manipulation was a cause of plaintiffs' loss. Therefore, the misstatements that concealed that manipulation also were a cause of plaintiffs' loss.

## IV. CONCLUSION

For the foregoing reasons, plaintiffs have alleged loss causation. Underwriters' motion for judgment on the pleadings is denied. The Clerk is directed to close this motion.

SO ORDERED.

---

**32.** *Castellano*, 257 F.3d at 186.

**33.** Underwriters argue that, in order to fully understand plaintiffs' loss causation theory and oppose the pending motion for class certification, plaintiffs must allege the date on which the manipulative conduct ended. While plaintiffs may eventually have to *prove* this end date, it is not a pleading requirement. Indeed, I ordered plaintiffs to produce any expert reports regarding loss causation *prior to* the date that defendants must submit their brief in opposition to plaintiffs' motion for class certification; such reports will, presumably, provide a factual basis for plaintiffs' allegations as to when the effect of the manipulative conduct ceased and the risk of damage therefore ended. *See* Order, *In re Initial Public Offering Sec. Litig.*, 21 MC 92 (S.D.N.Y. Dec. 15, 2003).

**34.** *See In re Initial Public Offering Sec. Litig.*, 241 F.Supp.2d at 310 ("According to the Complaint, Cacheflow's registration statement 'failed to disclose, among other things ... that the Allocating Underwriter Defendants had required Tie-in Agreements in allocating shares in the IPO and would receive Undisclosed Compensation in connection with the IPO.' ") (quoting Cacheflow Compl. ¶ 6).

**35.** 343 F.3d at 199 (quoting *Suez Equity*, 250 F.3d at 96).