## In re INITIAL PUBLIC OFFERING SECURITIES LITIGATION

### In re Rediff.Com India Ltd. Securities Litigation

Nos. 21 MC 92(SAS), 01 Civ. 3020(SAS).

United States District Court,
S.D. New York.

Oct. 15, 2004.

196

Christopher Lovell, Lovell Stewart Halebian LLP, New York, New York, for Plaintiffs.

Alan S. Goudiss, Shearman & Sterling LLP, New York, New York, for the Underwriter Defendants.

Geoffrey S. Stewart, Jones Day, New York, New York, for the Rediff Defendants.

## OPINION AND ORDER

SCHEINDLIN, United States District Judge:

This is a securities class action brought on behalf of all persons, other than defendants, who purchased or otherwise acquired American Depositary Shares ("ADSs") of Rediff.Com India Ltd. ("Rediff" or the "Company") in an initial public offering ("IPO") on June 14, 2000, and/or who purchased Rediff ADSs on the open market between the time of the IPO and April 4, 2001 (the "Class Period"). Plaintiffs have sued Rediff, the underwriters for Rediff's IPO,[1] and several officers and directors of the Company.[2] Plaintiffs' Consolidated Amended Securities Class Action Complaint ("CAC" or "Complaint") alleges that: (1) the Rediff Defendants and the Underwriter Defendants violated section 11 of the Securities Act of 1933[3] (the "Securities Act") and section 10 of the Securities Exchange Act of 1934[4] (the

---

1. These defendants include Goldman Sachs (Asia) L.L.C., Goldman Sachs & Co., Credit Suisse First Boston LLC, and Robert Fleming, Inc. (collectively, the "Underwriter Defendants").

2. These defendants include Ajit Balakrishnan, Nitin Gupta, Rajiv Warrier, and Richard Li

(collectively, the "Individual Defendants"). Rediff and the Individual Defendants are at times referred to as the "Rediff Defendants."

3. *See* 15 U.S.C. § 77k.

4. *See* 15 U.S.C. § 78j(b).

"Exchange Act"), as well as Rule 10b–5[5] promulgated thereunder, with respect to alleged "laddering" and Undisclosed Compensation in connection with Rediff's IPO; (2) the Individual Defendants violated section 15 of the Securities Act[6] and section 20 of the Exchange Act[7] with respect to the same alleged misconduct; (3) the Rediff Defendants and the Underwriter Defendants violated section 11 of the Securities Act as a result of allegedly false and misleading statements and omissions contained in the Registration Statement; (4) the Individual Defendants violated section 15 of the Securities Act with regard to such misstatements and omissions; (5) the Rediff Defendants violated section 10(b) and Rule 10b–5 with respect to allegedly false and misleading statements and omissions made after the IPO; and (6) the Individual Defendants violated section 20 of the Exchange Act with regard to such statements and omissions. Now pending are two motions to dismiss, filed by the Underwriter Defendants and the Rediff Defendants, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.[8] For the following reasons, the motions are granted in part and denied in part.

## I. FACTS

### A. Procedural History

In the spring of 2001, after the drop in the price for Rediff ADSs, five securities class actions were brought against Rediff and the Individual Defendants: *Khanna v. Rediff.com India Ltd.*, No. 01 Civ. 3020; *Steinberg v. Rediff.com India Ltd.*, No. 01 Civ. 3471; *Bhasin v. Rediff.com India Ltd.*, No. 01 Civ. 3593; *Karakunnel v. Rediff.com India Ltd.*, No. 01 Civ. 3814; and *Shives v. Bank of America Securities LLC*, No. 01 Civ. 4956. The first four cases alleged substantially identical misrepresentations and omissions in Rediff's Registration Statement and a Prospectus dated June 13, 2000. The *Shives* case was different. *Shives* did not allege any misrepresentations or omissions in Rediff's offering documents but instead mirrored the claims regarding the consolidated cases pending in *In re Initial Public Offering Sec. Litig.*, 21 MC 92(SAS).

The first four cases were initially assigned to the Honorable Richard Owen. In June of 2001, Suresh Khanna moved to be appointed lead plaintiff, along with Avanash M. Desai. Without ruling on the motion, Judge Owen transferred the cases to my docket for coordination with the IPO Securities Litigation. In September of 2001, I consolidated the five actions into the *Khanna* case and ordered that the other four cases be administratively closed. *See* 9/5/01 Order, Ex. 6 to Goudiss Aff. In August of 2003, nearly two years later, Khanna sought leave to file a consolidated amended complaint. On November 20, 2003, I appointed Khanna and Desai lead plaintiffs and gave them permission to file an amended complaint. *See* 12/1/03 Cor-

---

5. *See* 17 C.F.R. § 240.10b–5.

6. *See* 15 U.S.C. § 77o.

7. *See* 15 U.S.C. § 78t.

8. At a November 20, 2003 status conference, the Court told the Underwriter Defendants to "preserve" but not "rebrief" issues already decided in the Court's disposition of the motion to dismiss the consolidated IPO Securities Litigation, No. 21 MC 92. *See* Affidavit of Alan S. Goudiss ("Goudiss Aff."), attorney for the Underwriter Defendants, Ex. 1 at 21. Nonetheless, the Underwriter Defendants and Rediff Defendants have moved to dismiss the "laddering" and Undisclosed Compensation claims, arguing that plaintiffs' allegations do not satisfy the requirements of my earlier decision and the Second Circuit decision in *Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.*, 343 F.3d 189, 198 (2d Cir. 2003).

rected Order, Ex. 7 to Goudiss Aff. In that Order, Lovell Stewart Hallebian LLP was appointed co-lead counsel for plaintiffs' non-IPO claims.[9] *See id.*

### B. Rediff and the IPO

Rediff was incorporated in 1996 under the laws of India and has its headquarters in Mumbai, India. *See* CAC ¶ 13. The Company operates an Internet portal focused on India and the global Indian community. *See id.* Rediff's website consists of interest-specific channels, extensive community features, local language editions, sophisticated search capabilities, and online shopping. *See id.* ¶¶ 24–25. The website also offers e-mail, chat rooms, instant messaging, and personal homepages. *See id.* The Company also has a United States edition of its website whose content is geared to the Indian community living in the United States. *See id.* ¶ 25.

In connection with its IPO, Rediff filed with the Securities and Exchange Commission ("SEC") a Registration Statement dated June 12, 2000 ("RS")[10] and a Prospectus dated June 13, 2000("P")[11] (collectively, the "Offering Documents"). Both the Registration Statement and Prospectus contain fourteen pages of identical language discussing various risk factors associated with an investment in Rediff. Rediff's IPO of 4.6 million ADSs was priced at $12 per share and raised approximately $51 million in proceeds for the Company. *See* CAC ¶ 27; P at 1.

### C. Alleged Misstatements and Omissions in the Registration Statement

Plaintiffs allege that when the Registration Statement became effective, it contained untrue statements of material fact and omitted to state material facts in violation of section 11 of the Securities Act. *See* CAC ¶ 213. This claim is brought against Rediff as the issuer of the Registration Statement, Balakrishnan, Li and Warrier as signatories to the Registration Statement, Gupta as a director or person performing similar functions, and the Underwriter Defendants. *See id.* ¶¶ 214–216. These alleged misstatements and omissions relate to: (1) Rediff's e-mail system; (2) its revenue growth; and (3) the character and credentials of its management.

### 1. Statements and Omissions Concerning Rediff's E–Mail System

Plaintiffs allege that the Offering Documents failed to disclose that in March 2000, many of the e-mail boxes to subscribers to the Rediff website were deleted as a result of Rediff's system being overwhelmed by "junk mail." *See* CAC ¶ 52. Between twenty-five and fifty percent of subscribers' e-mail boxes were affected by this problem, which existed at the time of the IPO and continued throughout the Class Period. *See id.* The only way to remedy the problem was by providing the affected subscribers with new e-mail addresses. *See id.* Plaintiffs claim that this omission made the following statements contained in the Registration Statement

---

9. The non-IPO claims are the "garden variety" securities fraud claims addressed herein. The IPO allegations involve a scheme to defraud the investing public characterized by tie-in agreements, Undisclosed Compensation and analyst conflicts. The purpose of the alleged scheme was to fraudulently drive up the price of stock in hundreds of companies in the immediate aftermarket of their IPOs.

The IPO Securities Litigation action (21 MC 92) consists of 309 cases that have been consolidated for purposes of pre-trial supervision.

10. Ex. H to Declaration of Jayant W. Tambe ("Tambe Decl."), attorney for the Rediff Defendants.

11. Ex. 3 to Goudiss Aff.

under the caption entitled "Technology and Network Infrastructure" false and misleading:

- "Our operating infrastructure is designed to serve and deliver sufficient page views a day to allow India based users to access India specific services quickly. We continually update our capacity on these servers as our page views and web base increases." CAC ¶ 51(a).

- "We endeavor to configure our servers with enough resources to meet the load requirements of the visitors to our site." Id. ¶ 51(b).

- "We use in-house and third party monitoring software and tools and have 24 hour per day, 7 day a week monitoring to ensure that all of our services are available and operational all the time." Id. ¶ 51(c).

- "Most of our community services are internally-developed. Our e-mail system was developed internally using OpenSource programming technologies which can be scaled to millions of users without loss of performance." Id. ¶ 51(d).

- "Our e-commerce offerings are located on multiple servers to provide increased performance and redundancy in order to minimize service disruptions." Id. ¶ 51(e).

## 2. Statements and Omissions Concerning Revenues

Plaintiffs allege that the Offering Documents failed to disclose risks associated with advertising contract non-renewal and the downward trend in advertising pricing. In particular, plaintiffs claim that Rediff failed to disclose that at least seventy-five percent of its advertising contracts were set to expire in December 2000 and that its revenue could suffer materially if those contracts were not renewed. See CAC ¶ 63. Plaintiffs also claimed that in the months leading up to Rediff's IPO there was a downward trend in advertising rates. See id. Consequently, Rediff faced the risk of lower advertising revenue because even if its contracts were renewed, such renewals would be on less favorable pricing terms. See id. Plaintiffs allege that these omissions made the following statements false and misleading:

- Statements concerning historical revenue growth (from 1996 to 2000) and the growth in monthly page views (from April 1999 to March 2000). See id. ¶ 62(a) & (b).

- A statement that Internet usage in India is "experiencing rapid growth." Id. ¶ 62(c).

- Statements that Rediff believed that its "market opportunity includes the global Indian community living outside India" and its belief that it is "well positioned to capture the growth opportunities of the Internet in India." Id. ¶ 62(c) & (d).

- A statement that most of the Company's advertising agreements are for fixed rates and for fixed time periods. See id. ¶ 64(a).

- A statement that the Company believed that it had an efficient sales force to generate advertising revenues. See id.

- Statements that revenue is recognized ratably over the contractual period of the advertisement. See id. ¶ 64(b)-(e).

## 3. Statements and Omissions Concerning the Character and Credentials of Management

The following representation concerning defendant Richard Li is made in the Registration Statement: "Mr. Li holds a B.S. degree in Computer Engineering from

Stanford University." CAC ¶ 55. At the time of Rediff's IPO, many successful "dot.com" companies such as Rediff had been formed and/or managed by persons with computer engineering degrees from Stanford University. *See id.* ¶ 54. Such degrees were well-regarded by investors as an indicator of success. *See id.* This statement was false; Li later admitted that he did not graduate from Stanford University with a degree in computer engineering. *See id.*

Furthermore, the Offering Documents affirmatively represented that "As of the date of this [filing], we do not have any material legal proceedings against us." *See id.* ¶ 57 (alteration in original). Plaintiffs claim that this statement was false and misleading because at the time of the offering there was on ongoing investigation into possible criminal violations by Rediff, Balakrishnan and other Rediff officers and directors. *See id.* ¶ 58. In fact, a criminal complaint was filed on June 21, 2000, against Rediff, Balakrishnan and other directors and officers accusing them of distributing, publicly exhibiting, and putting into circulation obscene, pornographic and objectionable material. *See id.* ¶ 59. According to plaintiffs, Rediff was required to file timely an amendment to the Registration Statement, after its effective date, disclosing the issuance of the criminal complaint. *See id.* ¶ 58. It was not until November 14, 2001, however, that the criminal complaint was disclosed in the Company's quarterly report on Form 6–K for the fiscal quarter ending September 30, 2001. *See id.* ¶ 59.

## D. Cautionary Language Contained in the Registration Statement

Rediff's Registration Statement devotes fourteen pages to the disclosure of various risks associated with an investment in Rediff. For example, with respect to gener-alized risk, the Registration Statement advises that "[t]his offering involves a high degree of risk." RS at 7. Also disclosed is the fact that the Company has "limited historical financial information and operating history upon which you may evaluate us and our prospects." *Id.* at 11. The Registration Statement further cautions that the Company "cannot assure you that we will ever achieve or sustain profitability or that our operating losses will not continue to increase in the future. If we are unable to achieve or maintain profitability, we will be unable to build a sustainable business. In this event, the price of our ADSs and the value of your investment would likely decline." *Id.* at 12.

The Registration Statement also contains cautionary language about the uncertainty surrounding high-technology ventures in general and Internet ventures in particular. The following disclosures relate to Rediff's e-mail system, its revenue growth, and the trend in advertising rates.

### 1. Disclosures Regarding E–Mail

The following disclosures relate to Rediff's e-mail system:

- Factors expected to affect the Company's long-term performance include: (1) the Company's ability to adequately maintain, upgrade and develop its portal, its computer network, and the systems used to process customer orders and payments; and (2) "technical difficulties, system or website downtime or Internet service disruptions." RS at 13.

- "[F]ailure of key primary or back-up systems could lead to a disruption of our services and loss of important data. This in turn could lead to a loss of users and customers and damage to our reputation. These failures, which could have a significant adverse effect on our business and

results of operations, could also lead to significant negative publicity and litigation and to a decline in the market price of our ADSs. Recently, several large Internet companies have suffered highly publicized system failures which resulted in adverse reactions to their stock prices [and] significant negative publicity." *Id.* at 14.

● "We have suffered temporary service outages from time to time which have resulted in a disruption of our services which have lasted no longer than 30 minutes.˙ As a result of such outages, Internet users are temporarily unable to access our content, community and e-commerce offerings. *Any sustained disruption will reduce the number of visitors to our website and have a material adverse impact on the number of revenues from e-commerce transactions handled through our website.* Such disruptions could also reduce the number of advertisers on our site and materially affect our results of operations." *Id.* at 15.

● The Company offers Internet-based e-mail services which may expose it to potential liabilities or claims resulting from: "unsolicited mail; lost or misdirected e-mail; illegal or fraudulent use of e-mail; and interruptions or delays in e-mail services." *Id.* at 18.

2. **Disclosures Regarding the Loss of Advertising Contracts**

The following disclosures relate to a possible loss of revenues from non-renewal of advertising contracts.

● "A reduction in traffic on our website may cause advertisers not to renew their contractual arrangements with us which, in turn, would reduce our advertising revenues." RS at 11.

● "[W]e have limited historical financial information and operating history upon which you may evaluate us and our prospects. You should consider that challenges that an early stage company like ours faces" including the need to "attract a larger number of advertisers from a variety of industries." "We cannot be sure we will be successful in meeting these challenges and risks." *Id.* at 12.

● "Our business faces significant competition from other well-established Indian online content providers, as well as numerous new entrants.... This makes it difficult to predict our future advertising rates and revenues. Our˙ revenues could be adversely affected if we are unable to adapt new forms of pricing for the services and products we offer. Increased competition may result in ... loss of advertisers ... [and] loss of market share." *Id.* at 14.

● "Currently, most of our advertisers enter into agreements pursuant to which they pay a fixed fee for a fixed time-period. These agreements range from three months to one year." P at 53.

3. **Disclosures Regarding the Downward Trend in Advertising Rates**

● "Online advertising is an unproven business and our ability to generate and maintain significant advertising revenues will depend on ... our ability to attract advertisers at profitable rates in light of intense competition[.]" RS at 11.

● "There are an increasing number of companies that provide websites focusing on India and the global community. All of these companies com-

pete with us for visitors, advertising dollars and e-commerce revenues. Competition for visitors and e-commerce is intense and is expected to increase significantly in the future because there are not substantial barriers to entry in our market." "Increased competition could result in lower advertising rates[.]" "These competitors may also be able to ... adopt more aggressive advertising pricing policies[.]" P at 56.

### E. Statements Made After Rediff's IPO

Plaintiffs allege that the Rediff Defendants caused the Company to issue materially false and misleading press releases and SEC filings during the Class Period. *See* CAC ¶ 130. As a result, plaintiffs claim that the Rediff Defendants violated section 10(b) of the Exchange Act as well as Rule 10b–5. The following statements are alleged to be false and misleading as a result of the foregoing omissions regarding Rediff's e-mail system, its revenue growth, and the character and credentials of its management.

- On July 17, 2000, the Individual Defendants caused Rediff to issue an earnings press release for the fiscal quarter ending June 30, 2000. That release included statements that revenues increased as compared to the same quarter in 1999 and gross margins stayed the same. The release also stated that Rediff signed significant agreements with Nike and Orange. *See* CAC ¶ 66. The press release also stated that the number of Rediff e-mail users increased by 58% since March 31, 2000, which is 21 times the number of e-mail users in the same quarter of 1999. *See id.* ¶ 69.

- On July 17, 2000, Balakrishnan stated in a press release: " 'Today I am very pleased to report that we have completed this quarter with strong revenue growth, [and] a significant increase in subscribers. . . .' " *Id.* ¶ 68 (quoting July 17, 2000 press release).

- On August 14, 2000, Rediff filed its fiscal quarter results for the quarter ending June 30, 2000 on Form 6–K. Form 6–K contained the same statements concerning revenue growth and Rediff's e-mail as those made in the July 17, 2000 press release. *See id.* ¶ 73. Form 6–K also contained the same statements made in the Offering Documents concerning the fixed and ongoing nature of Rediff's advertising contracts. *See id.* ¶ 74. The August 14, 2000 Form 6–K also made the following affirmative misrepresentation: "The Company is not currently party to any material legal proceedings." *Id.* ¶ 75.

- On August 22, 2000, the Individual Defendants caused the Company to disseminate a "Proxy Information to Holders of Equity Shares" letter. This letter contained a proposal appointing Li as a Board Director. *See id.* ¶ 77. Following this proposal, Balakrishnan stated that the Board recommended this proposal. *See id.* ¶ 78.

- On September 11, 2000, the Individual Defendants caused the Company to file a Form 6–K, Rediff's Annual Report for the fiscal year ended March 31, 2000. The Form 6–K stated, *inter alia,* that advertising revenue is recognized ratably over the contractual period of the advertisement. *See id.* ¶ 80. Attached to Form 6–K was Exhibit 99.2 which stated that Li holds a B.S. degree in computer engi-

neering from Stanford University. *See id.* ¶ 82(a).

- On September 21, 2000, Warrier stated in an article published in *Business Today* that " 'Gross margins will climb even higher. As revenues increase, the cost of getting those revenues won't rise as much.' " *Id.* ¶ 83.
- On October 12, 2000, the Individual Defendants caused the Company to issue its earnings announcement for the second 2001 fiscal quarter ending September 30, 2000. That press release stated, *inter alia*, that Rediff signed multiple agreements with leading international brands, that it entered into a strategic partnership with ICICI Limited, and that its newly-launched Olympics channel was sponsored by international brands. *See id.* ¶ 87. In that release, Balakrishnan stated that " 'Strong revenue growth ... demonstrates that the fundamentals of the Company remain strong.' " *Id.* ¶ 89. Rediff's November 14, 2000 Form 6–K contained, as Exhibit 99.1, the October 12, 2000 press release. *See id.* ¶ 91. That Exhibit also contained statements regarding the fixed and ongoing nature of Rediff's advertising contracts. *See id.* ¶ 92. Furthermore, the Form 6–K made the affirmative misrepresentation that " 'The Company is not currently a party to any material legal proceedings.' " *Id.* ¶ 93.
- On January 17, 2001, the Individual Defendants caused the Company to issue a press release announcing Rediff's 2001 third fiscal quarter results. That press release contained historical facts regarding percentage increases in Rediff's revenues. In that press release, Balakrishnan made statements regarding Rediff's future profitability. *See id.* ¶¶ 97–98. The press release also contained historical facts regarding the growth in the number of Rediff's e-mail users. *See id.* ¶ 100. The Form 6–K filed on January 17, 2001 included the press release issued that day.

- On February 13, 2001, Rediff filed its Form 6–K for the third fiscal quarter of 2001. The Form 6–K contained statements regarding the fixed and ongoing nature of Rediff's advertising contracts. The Form 6–K also stated that the Company is not currently a party to any material legal proceedings. *See id.* ¶¶ 104–105.

**F. Allegations of Scienter**

With regard to scienter, plaintiffs allege that:

the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding the Company and/or their control over the Company, which made them privy to confidential proprietary information, participated in the fraudulent scheme alleged herein. With respect to defendants' statements and/or omissions, defendants knew and/or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public. Defendant Li knew that he did not graduate from Stanford.

CAC ¶ 131. The Individual Defendants are alleged to have engaged in a fraudulent scheme and course of conduct to inflate the price of the Company's ADSs in order to: (1) consummate acquisitions using Rediff ADSs as consideration; and (2) obtain advertising and sponsorship business. *See id.* ¶ 132.

In particular, plaintiffs allege that in October 2000, the Company touted a proposed stock-for-stock acquisition of a company called ThinkIndia.com. *See id.* ¶ 135.

Shortly thereafter, however, the proposed exchange for the acquisition was changed to cash-for-stock. *See id.* ¶¶ 136, 137 ("the Company will acquire US-based ThinkIndia.com for $3.0 million in cash instead of issuing up to 650,000 American Depository Receipts as previously agreed") (internal quotation marks omitted). Plaintiffs also allege that "defendants were highly motivated to conceal known adverse information concerning expiring contracts, ongoing e-mail in-box deletions, the Indian criminal complaint, and misrepresentations concerning defendant Li's credentials to retain and obtain advertising and sponsorship clients." *Id.* ¶ 146.

### F. Service of Process

The Rediff Defendants claim that plaintiffs never made complete and timely service of process on defendants Balakrishnan, Gupta, and Warrier in each of the individual cases. *See* Tambe Decl. ¶ 6. Plaintiffs dispute this, contending that the law firm of Lovell Stewart Halebian LLP effected service on Balakrishnan, Gupta and Warrier "through registered post direct," as instructed by the Indian authorities, on several occasions throughout September 2003. *See* Declaration of Gary S. Jacobson ("Jacobson Decl."), attorney for plaintiffs, ¶ 8.[12] There is no allegation that the Consolidated Amended Securities Class Action Complaint was ever served on these individual defendants.

At a conference held on November 20, 2003, this Court attempted to resolve the service of process issue. It was agreed by the parties that defendant Li was properly served under the Hague Convention. *See* 11/20/03 Transcript, Ex. 1 to the Goudiss Aff., at 7. As to the remaining three individual defendants, plaintiffs' counsel stated that he made service on a registered agent in Delaware, Incorporating Services, Ltd. *See id.* at 9. The Rediff Defendants admitted that service on the registered agent in Delaware was proper as to Rediff. *See id.* at 10. However, they argued that service on Rediff's registered agent in Delaware was not good service as to Balakrishnan, Gupta and Warrier because Incorporating Services, Ltd. had not been appointed as agent for these defendants and therefore could not accept service on their behalf. These defendants therefore seek dismissal on statute of limitations grounds.

## II. LEGAL STANDARDS

### A. Motion to Dismiss Standard

When deciding a motion to dismiss pursuant to Rule 12(b)(6), a court must construe the complaint in the light most favorable to the plaintiff and accept the factual allegations in the complaint as true. *See Desiano v. Warner–Lambert Co.*, 326 F.3d 339, 347 (2d Cir.2003). Courts may not consider matters outside the pleadings but may consider documents attached to the pleadings, documents referenced in the pleadings, or documents that are integral to the pleadings. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152–53 (2d Cir.2002). In addition, in securities fraud actions, courts may consider public disclosure documents that have been filed with the Securities Exchange Commission. *See*

---

**12.** In particular, plaintiff Khanna served Warrier at two addresses in India by "registered post direct" on July 11, 2003. *See* Jacobson Decl. ¶ 9. Khanna also served Balakrishnan, Gupta and Warrier at Rediff's address in India by "registered post direct" on September 10, 2003. *See id.* ¶ 10. Plaintiffs in the individual cases served Balakrishnan at Rediff's address in India by "registered post direct" on September 16, 2003. *See id.* ¶ 11. The individual plaintiffs served Warrier at two addresses in India by "registered post direct" on September 12, 2003, and also served Gupta at Rediff's address in India by "registered post direct" that day. *See id.* ¶¶ 12–13.

*Rothman v. Gregor,* 220 F.3d 81, 88 (2d Cir.2000).

"Given the Federal Rules' simplified standard for pleading, '[a] court may dismiss a complaint *only* if it is clear that no relief could be granted under *any* set of facts that could be proved consistent with the allegations.'" *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 514, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) (emphasis added) (quoting *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984)). *See also Gmurzynska v. Hutton,* 355 F.3d 206, 210 (2d Cir.2004) ("A complaint 'should not be dismissed for failure to state a claim unless it appears beyond doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'") (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). "Thus, the issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Desiano,* 326 F.3d at 347 (internal quotation marks and citation omitted).

### B. Standards Under the Securities Laws

#### 1. Section 11 of the Securities Act

■ "The Securities Act of 1933 ... was designed *to provide investors with full disclosure of material information concerning public offerings of securities* in commerce, to protect investors against fraud and, through the imposition of specified civil liabilities, to promote ethical stan-

dards of honesty and fair dealing." *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 195, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976) (citation omitted). Section 11 of the Securities Act "was designed to assure compliance with the disclosure provisions of the [Securities] Act by imposing a stringent standard of liability on the parties who play a direct role in a registered offering." *Herman & ·MacLean v. Huddleston,* 459 U.S. 375, 381–82, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983) (footnote omitted).

■ To state a claim under section 11, plaintiffs must allege that "the registration statement ... contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading...." 15 U.S.C. § 77k(a).[13] The truth of a statement made in the registration statement is judged by the facts as they existed when the registration statement became effective. *See In re MobileMedia Sec. Litig.,* 28 F.Supp.2d 901, 923 (D.N.J.1998). A claim under this section may be asserted against every person who signed the registration statement, the directors of the issuer and the underwriter of the security. *See* 15 U.S.C. § 77k(a).

■ Section 11 does not require a plaintiff to allege "the scienter or reliance elements of a fraud cause of action." *Rombach v. Chang,* 355 F.3d 164, 169 n. 4 (2d Cir.2004) (citing *Herman & MacLean,* 459 U.S. at 382, 103 S.Ct. 683). However,

---

**13.** Section 11 states, in pertinent part, as follows:

In case any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, any person acquiring such security ... may sue—

(1) every person who signed the registration statement;

(2) every person who was a director of (or person performing similar functions) ... the issuer ...;

(5) every underwriter with respect to such security.

15 U.S.C. § 77k(a).

although fraud is not an element of a section 11 claim, claims under section 11 are often predicated on fraud. Where section 11 claims are premised on allegations of fraud, the heightened pleading standard of Rule 9(b) applies. *See id.* at 171 ("So while a plaintiff need allege no more than negligence to proceed under Section 11 . . . claims that do rely upon averments of fraud are subject to the test of Rule 9(b).").

 "The particularity requirement of Rule 9(b) serves to provide a defendant with fair notice of a plaintiff's claim, to safeguard a defendant's reputation from improvident charges of wrongdoing, and to protect a defendant against the institution of a strike suit." *Id.* (internal quotation marks and citation omitted). To accomplish these objectives, Rule 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed.R.Civ.P. 9(b). To comply with the requirements of Rule 9(b), a plaintiff must: "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Rombach,* 355 F.3d at 170 (internal quotation marks and citation omitted).

 Where the underlying allegations do not "sound in fraud," the applicable pleading standard is set forth in Rule 8(a). Under that Rule, a complaint adequately states a claim when it contains "a short and plain statement of the claim showing that the pleader is entitled to relief." *Swierkiewicz,* 534 U.S. at 512, 122 S.Ct. 992 (citing Rule 8(a)(2)). Under Rule 8(a)'s liberal pleading standard, a complaint is sufficient if it gives "fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Id.* Thus, where a section 11 claim is not premised on fraud, a plaintiff need only allege that the registration statement contains a material misstatement or omission. *See In re Twinlab Corp. Sec. Litig.,* 103 F.Supp.2d 193, 201 (E.D.N.Y.2000) ("Section 11 'places a relatively minimal burden on a plaintiff,' requiring simply that the plaintiff allege that he purchased the security and that the registration statement contains false or misleading statements concerning a material fact.") (quoting *Herman & MacLean,* 459 U.S. at 381–82, 103 S.Ct. 683); *Degulis v. LXR Biotechnology, Inc.,* No. 95 Civ. 4204, 1997 WL 20832, at *3 (S.D.N.Y. Jan.21, 1997) ("[T]o make out a prima facie case at the pleadings stage, Plaintiffs need only allege a material misstatement or omission. Neither knowledge nor reason to know is an element in a plaintiff's prima facie case.").

## 2. Section 10(b) and Rule 10b–5 of the Exchange Act

The fundamental purpose of the federal securities laws "was to substitute a philosophy of full disclosure for the philosophy of caveat emptor and thus to achieve a high standard of business ethics in the securities industry." *SEC v. Capital Gains Research Bureau, Inc.,* 375 U.S. 180, 186, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963). Section 10(b) of the Exchange Act in particular is designed to protect investors by serving as a "catchall provision" which prohibits manipulative practices by defendants acting in bad faith. *See Hochfelder,* 425 U.S. at 206, 96 S.Ct. 1375. To accomplish this objective, section 10(b) provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange . . .

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b). To implement this statute, the SEC promulgated Rule 10b–5, which specifies what is forbidden by section 10(b). Rule 10b–5 states:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5.

 To state a prima facie case for securities fraud under these provisions, a plaintiff must allege that " 'the defendant, in connection with the purchase or sale of securities, made a materially false statement or omitted a material fact, with scienter, and that plaintiff's reliance on

defendant's action caused injury to the plaintiff.' " *Lawrence v. Cohn*, 325 F.3d 141, 147 (2d Cir.2003) (quoting *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 161 (2d Cir.2000) (citing cases)). The requisite state of mind, or scienter, in an action under section 10(b) and Rule 10b–5 is " 'an intent to deceive, manipulate or defraud.' " *Ganino*, 228 F.3d at 168 (quoting *Hochfelder*, 425 U.S. at 193 n. 12, 96 S.Ct. 1375).

 Securities fraud actions are subject to the pleading requirements of Rule 9(b). *See In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 69–70 (2d Cir.2001). In addition, a plaintiff who alleges securities fraud under section 10(b) and Rule 10b–5 must also satisfy the heightened pleading standards of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), Pub.L. No. 104–67, 109 Stat. 737 (1995). *See Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir.2000). In order to plead a material misrepresentation or omission under the PSLRA "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information or belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1). The PSLRA further requires the plaintiff to "state with particularity facts giving rise to a strong inference that the defendant acted with the requisite state of mind." 15 U.S.C. § 78u–4(b)(2).

### 3. Control Person Liability

#### a. Section 15 of the Securities Act

 To establish a prima facie section 15 claim,[14] a plaintiff need only estab-

---

14. Section 15 states:

Every person who, by or through stock ownership, agency, or otherwise, or who,

pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock owner-

lish control and an underlying violation of section 11. *See In re Independent Energy Holdings PLC Sec. Litig.*, 154 F.Supp.2d 741, 770 (S.D.N.Y.2001). Rule 9(b) does not apply to the pleading of a section 15 claim because fraud is not an element of that claim. *See In re IPO Sec. Litig.*, 241 F.Supp.2d 281, 352 (S.D.N.Y.2003). And the PSLRA does not apply because section 15, which arises under the Securities Act, does not require proof of scienter. *See id.* Therefore, section 15 claims need only be pleaded under Rule 8 of the Federal Rules of Civil Procedure; defendants are only entitled to notice that they allegedly controlled an entity that violated section 11.[15] *See id.*

### b. Section 20(a) of the Exchange Act

Section 20(a) of the Exchange Act creates a cause of action against defendants alleged to have been "control persons" of those engaged in the primary securities fraud. The section provides:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a). The statutory language identifies two components to a control person claim: (1) a primary violation by a controlled person; and (2) direct or indirect control of the primary violator by the defendant. *See In re WorldCom, Inc. Sec. Litig.*, 294 F.Supp.2d 392, 414 (S.D.N.Y.2003). Primary liability by the controlling person is not a necessary predicate to a section 20(a) claim, which is typically used to sue defendants who do not have primary liability. *See In re IPO,* 241 F.Supp.2d at 392, n. 178 ("In that sense, Section 20 serves as a statutory form of *respondeat superior.*").

■ Scienter is not an essential element of a section 20(a) claim. *See id.* at 396. Section 20(a) must therefore be pleaded only in accordance with Rule 8(a). *See id.* Neither the PSLRA (because scienter is not an essential element), nor Rule 9(b) (because fraud is not an essential element), apply to a section 20(a) claim. *See id.* Therefore, plaintiffs need only allege a primary violation by the controlled person and control of the primary violator by the defendants.

## III. DISCUSSION

### A. Service on Defendants Balakrishnan, Gupta and Warrier

■ The statute of limitations for claims pursuant to section 10(b) and Rule 10b–5 is "within one year after the discovery of the facts constituting the violation and within three years after such viola-

---

ship, agency, or otherwise, controls any person liable under sections 77k or 77*l* of this title, shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist.

15 U.S.C. § 77*o*.

**15.** Control is " 'the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.' " *SEC v. First Jersey Sec., Inc.,* 101 F.3d 1450, 1472–73 (2d Cir.1996) (quoting 17 C.F.R. § 240.12b–2).

tion." 15 U.S.C. § 78i(e). The same one-year statute of limitations applies to claims brought under section 15 of the Securities Act. *See* 15 U.S.C. § 77m. The running of the statute of limitations is "tolled from the date that a suit is filed" to permit service of process. *Novak v. National Broad. Co.*, 131 F.R.D. 44, 45 (S.D.N.Y. 1990). The Rediff Defendants argue that because Balakrishnan, Gupta and Warrier were not served within 120 days after the filing of the complaints in the individual cases, the statute of limitations has lapsed and the claims against these defendants are time-barred.

Defendants conflate statute of limitations with service of process. The statute of limitations was tolled in the Spring of 2001, when the individual cases were first filed. The fact that three individual defendants may not have been served properly within 120 days after those filings is of no moment here because the 120–day time limit for service of process found in Rule 4(m) is not applicable in the case of foreign defendants. *See* Fed.R.Civ.P. 4(m). Furthermore, the Second Circuit strongly prefers that litigation be resolved on the merits, rather than by dismissal. *See Cody v. Mello*, 59 F.3d 13, 15 (2d Cir.1995).

▪ The Individual Defendants cannot complain that the mailings made "registered post direct" in September 2003 were untimely because these defendants had actual notice of the non-IPO allegations from the outset of this litigation and actively participated in this action. *See United States Fire Ins. Co. v. Jesco Constr. Corp.*, No. 03 Civ. 2906, 2003 WL 21689654, at *3 (S.D.N.Y. July 16, 2003) ("The primary purpose of service of process is give a defendant legal notice of the claims asserted against him so that he may prepare his defense."). Because the Individual Defendants had actual notice of this litigation, they cannot be prejudiced by untimely ser-

vice. *See AIG Managed Market Neutral Fund v. Askin Capital Mgmt., L.P.*, 197 F.R.D. 104, 111 (S.D.N.Y.2000) ("The fact that [defendant] had actual notice that an action was filed against it militates against a finding of prejudice since the 'core function' of service is to supply notice 'in a manner and at a time that affords the defendant a fair opportunity to answer the complaint and present defenses and objections.'") (quoting *Henderson v. United States*, 517 U.S. 654, 672, 116 S.Ct. 1638, 134 L.Ed.2d 880 (1996)). Therefore, rather than employ the harsh remedy of dismissal, *see Cody*, 59 F.3d at 15, plaintiffs must serve their Consolidated Amended Securities Class Action Complaint upon the Individual Defendants forthwith in a manner that comports with Rule 4(f).

▪ Defendants' argument regarding the statute of limitations and the criminal charges of pornography may fare better. The Amended Complaint alleges that Rediff and certain officers and directors were the subject of criminal charges involving the publication of pornographic materials in June 2000, after the final Prospectus was issued. In its Form 20–F, filed with the SEC on July 12, 2002, Rediff disclosed the filing of a criminal complaint. However, the allegations regarding the failure to disclose the criminal charges did not appear in any of the original individual complaints but were first raised in the Amended Complaint filed on November 24, 2003. Because the allegations regarding the criminal charges do not relate back to the allegations concerning Li's educational background, they are time-barred. *See* Fed.R.Civ.P. 15(c)(2). Accordingly, these allegations cannot support any of plaintiffs' claims and are stricken from the Amended Complaint.

## B. The Section 11 Claims

Except for Li's educational background, none of the statements contained in the

Registration Statement, *see supra* Part I.C, were misleading. The statement concerning Li's degree from Stanford University was indisputably untrue and, therefore, misleading. Accordingly, this allegation sounds in fraud and therefore must meet the requirements of Rule 9(b). Plaintiffs have, however, satisfied these requirements with regard to this statement. Whether that statement is material is another question.

■■■■■ The remaining allegedly misleading statements consist of non-actionable accurate statements of historical fact and statements of opinion. Plaintiffs do not allege, other than in conclusory terms, how the statements of historical fact were made misleading as a result of the alleged omissions. "The disclosure of accurate historical data does not become misleading even if less favorable results might be predictable by the company in the future." *In re Sofamor Danek Group, Inc.,* 123 F.3d 394, 401 n. 3 (6th Cir.1997). Furthermore, to be actionable, the representation must be one of existing fact, not merely an expression of opinion, belief or expectation. *See In re Duane Reade Inc. Sec. Litig.,* No. 02 Civ. 6478, 2003 WL 22801416, at *4 (S.D.N.Y. Nov.25, 2003), *aff'd sub nom. Nadoff v. Duane Reade, Inc.,* 107 Fed. Appx. 250 (2d Cir.2004) (summary order). A company's statements of hope, opinion, or belief about its future performance or general market conditions are not actionable under the securities laws. *See San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.,* 75 F.3d 801, 811 (2d Cir.1996).

■■■■■ However, the omissions themselves may give rise to section 11 liability. "Allegations that 'material facts have been omitted' from a registration statement or 'presented in such a way as to obscure or distort their significance' are sufficient to state a claim for violation of Section 11."

*In re WorldCom,* 294 F.Supp.2d at 407 (quoting *I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co.,* 936 F.2d 759, 761 (2d Cir.1991)). Although plaintiffs do bring a fraud claim based on these omissions, their non-disclosure in the Registration Statement was more likely the result of negligence than fraud. Therefore, the requirements of Rule 9(b) do not apply. The question, then, is whether the omissions regarding Rediff's e-mail system, its revenue growth, and the trend in advertising rates were material.

### 1. Materiality

■■■■■ Material facts may "include not only information disclosing the earnings and distributions of a company but also those facts which affect the probable future of the company and those which may affect the desire of investors to buy, sell, or hold the company's securities." *Kronfeld v. Trans World Airlines, Inc.,* 832 F.2d 726, 732 (2d Cir.1987). A statement is material where there is a substantial likelihood that a reasonable person would consider it important when deciding whether to buy or sell securities. *See TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976) (stating that an omission is material if there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of the information made available").

■■■■■ Thus, at the pleadings stage, a plaintiff satisfies the materiality requirement by alleging an omission that a reasonable investor would have considered significant in making investment decisions. *See Basic Inc. v. Levinson,* 485 U.S. 224, 231, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988). The Second Circuit has held that, "when presented with a Rule 12(b)(6) motion, 'a complaint may not properly be dismissed

... on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance.'" *Ganino*, 228 F.3d at 162 (quoting *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir.1985)). *See also In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267, 274–75 (3d.Cir.2004) ("Materiality is ordinarily an issue left to the factfinder and is therefore not typically a matter for Rule 12(b)(6) dismissal.").

■■■ Here, the alleged omissions could have influenced a reasonable investor in deciding whether to purchase Rediff ADSs. The omissions concerning the expiration of seventy-five percent of Rediff's advertising contracts in one month and the problems with its e-mail system could very well have affected investment decisions. Nor can it be said that the misrepresentation regarding Li's educational background is immaterial given the cachet associated with a computer engineering degree from Stanford University. *See* CAC ¶ 54. Finally, Item 303 of Regulation S–K [16] might have required disclosure of the downward trend in advertising rates. An omission of fact "required to be stated" under Item 303 will generally produce liability under section 11. *See Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1296 (9th Cir. 1998) ("[A]llegations which sufficiently state a claim under Item 303 also state a claim under section 11."). Regardless of whether Rediff's failure to disclose the downward trend in advertising rates was a violation of Item 303, a downward trend could significantly and adversely impact the results of operations. Thus, it cannot be said that the omission regarding the downward trend in advertising rates, as

well as the omissions regarding the expiration of Rediff's advertising contracts and its problem with its e-mail system, are immaterial as a matter of law. *See Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 357 (2d Cir.2002) ("Recognizing that the materiality of an omission is a mixed question of law and fact, courts often will not dismiss a securities fraud complaint at the pleading stage of the proceedings, unless reasonable minds could not differ on the importance of the omission"). Thus, these alleged omissions cannot be dismissed on grounds of materiality unless the "bespeaks caution" doctrine applies.

### 2. Bespeaks Caution Doctrine

■■■ Under the "bespeaks caution" doctrine, a misrepresentation or omission will be considered immaterial if the registration statement contains cautionary language sufficiently specific to render reliance on the false or omitted statement unreasonable. *See P. Stolz Family P'ship L.P. v. Daum*, 355 F.3d 92, 96 (2d Cir. 2004); *see also Halperin*, 295 F.3d at 357 ("Certain alleged misrepresentations in a stock offering are immaterial as a matter of law because it cannot be said that any reasonable investor could consider them important in light of adequate cautionary language set out in the same offering."); *Olkey v. Hyperion 1999 Term Trust, Inc.*, 98 F.3d 2, 5 (2d Cir.1996) (finding no liability where prospectus gave "prominent and specific" warnings of "exactly the risk the plaintiffs claim was not disclosed" so as to "bespeak caution").

■■■ Generalized disclosures of amorphous risks will not shield defendants from liability as the cautionary language must be "too prominent and specific to be disre-

---

**16.** Item 303 requires companies to disclose, on Form 10–Q, any known trends that would have or were reasonably likely to have a material impact on revenues. *See* 17 C.F.R. § 229.303(a)(1) (2003).

garded" and must "warn investors of exactly the risk that plaintiffs claim was not disclosed." *Id.* Moreover, if a party is aware of a particular problem worthy of disclosure, the party may not rely on general disclaimers to avoid liability. "[T]he inclusion of general cautionary language regarding a prediction would not excuse the alleged failure to reveal known material, adverse facts." *Rubinstein v. Collins,* 20 F.3d 160, 171 (5th Cir.1994).

> Cautionary language in securities offerings is just about universal. Thus, the key question a district court must decide when determining whether to grant a motion to dismiss a securities fraud complaint is whether plaintiffs have overcome the existence of such language. Plaintiffs may do this by showing, for example, that the cautionary language did not expressly warn of or did not directly relate to the risk that brought about plaintiffs' loss.

*Halperin,* 295 F.3d at 359.

■ Here, the Registration Statement contains some cautionary language regarding the loss of advertising contracts and potential problems with the e-mail system. However, the alleged omissions with respect thereto are specific and factual. Plaintiffs are not complaining that they were not advised that Rediff could face a possible loss of revenues from the non-renewal of advertising contracts, they are complaining that they were not advised that seventy-five percent of such contracts were due to expire *in one month.* Similarly, with regard to Rediff's e-mail systems, plaintiffs are not complaining that Rediff did not disclose the usual problems associated with any e-mail system, they are com-

plaining that Rediff did not disclose the peculiar problem it had with the deletion of e-mail addresses when its system became overwhelmed with "junk mail." Because the cautionary language contained in the Registration Statement does not appear to cover these specific omissions, the "bespeaks caution" doctrine cannot insulate defendants from liability.[17]

■ The nondisclosure of the downward trend in advertising rates is a different matter. The Registration Statement specifically indicates that advertising rates may be lower in the future and attributes the reason for such decline to increased competition. This warning, which goes to the heart of the non-disclosure, is sufficient to warn investors of a potential decline in advertising rates. Moreover, the trend in advertising rates is publicly available information. Plaintiffs' section 11 claim based on this omission is therefore dismissed. *See Elliott Assocs., L.P. v. Covance, Inc.,* No. 00 Civ. 4115, 2000 WL 1752848, at *9 n. 12 (S.D.N.Y. Nov.28, 2000) ("[T]he securities laws do not require that investors be treated like children ... [i]nvestors know that the stock market is a risky business, and that when a company's officers make predictions ... they are not issuing guarantees.") (internal quotation marks and citations omitted) (alterations in original).

## C. Section 15 Control Person Liability

■ Plaintiffs have sufficiently alleged the elements of a control person claim under section 15, namely, control over the primary violator[18] and a primary violation

---

**17.** The fact that Gupta did not sign the Registration Statement is of no significance because at the time of the Registration Statement, he was a Rediff director, or person performing a similar function. *See* ¶ at 61

("Nitin Gupta has been President and Chief Operating Officer of Rediff.com India Limited since February 2000.").

**18.** Control is " 'the power to direct or cause the direction of the management and policies

of section 11. However, this claim is duplicative given that the Individual Defendants are alleged to be primary violators under section 11. If a violation of section 11 is ultimately proven, the Individual Defendants will be found liable regardless of Rediff's liability. If the section 11 claim fails, there is no primary violator and the section 15 claim cannot succeed. Because it is redundant of the section 11 claims, the control person claim under section 15 is dismissed. *See Union Carbide Corp. v. Montell, N.V.,* 944 F.Supp. 1119, 1136 (S.D.N.Y.1996) (dismissing claim for breach of implied duty of good faith and fair dealing for being redundant to breach of contract claims).

### D. Plaintiffs' Section 10(b) and Rule 10b–5 Claims (non-IPO)

For the same reasons that plaintiffs' allegations of misrepresentations fail to support a claim under section 11, most of the representations made after Rediff's IPO similarly fail to support a claim under section 10(b) and Rule 10b–5. *See Rombach,* 355 F.3d at 174 ("To succeed on this [section 10(b) ] claim, plaintiffs must do more than say that the statements in the press releases were false and misleading; they must demonstrate with specificity why and how that is so."); *Elliott Assocs.,* 2000 WL 1752848, at *7 ("[T]he Complaint fails to explain how any of the statements at issue were false or misleading at the time made. This defect is fatal to plaintiff's claims."). However, plaintiffs may proceed with re-

spect to the misrepresentation concerning Li's educational background and the post-IPO omissions concerning Rediff's revenues and e-mail system.[19] The remaining alleged misrepresentations made after the IPO consist of representations of historical facts and opinions by Rediff's officers. As such, they are not actionable. *See Novak v. Kasaks,* 216 F.3d 300, 309 (2d Cir.2000) (stating that as long as public statements are consistent with reasonably available data, corporate officials need not present an overly gloomy picture of current performance and future prospects). The question, then, is whether plaintiffs have sufficiently alleged scienter.

#### 1. Scienter

In order to state a claim under section 10(b) and Rule 10b–5, a plaintiff must allege that a defendant acted with scienter. *See Novak,* 216 F.3d at 306. Plaintiffs may establish a strong inference of scienter by pleading facts: (1) that demonstrate that defendants had both the motive and opportunity to commit fraud; or (2) that "constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Rothman,* 220 F.3d at 90. Thus, plaintiffs may successfully plead scienter in the following manners:

where the complaint sufficiently alleges that the defendants: (1) benefitted in a concrete and personal way from the purported fraud . . . ; (2) engaged in deliberately illegal behavior . . . ; (3) knew

of a person, whether through the ownership of voting securities, by contract, or otherwise.' " *First Jersey Sec.,* 101 F.3d at 1472–73 (quoting 17 C.F.R. § 240.12b–2). Given the high-ranking offices of the Individual Defendants, it is highly likely they controlled the day-to-day operations and policies of Rediff.

**19.** Furthermore, the requirements of Rule 9(b) have been clearly satisfied here. Rule 9(b) requires a complaint to: " '(1) specify the

statements [or omissions] that the plaintiff contends were fraudulent, (2) identify the speaker [or the person responsible for not disclosing the omissions], (3) state where and when the statements were made, and (4) explain why the statements [or omissions] were fraudulent.' " *Stevelman v. Alias Research Inc.,* 174 F.3d 79, 84 (2d Cir.1999) (quoting *Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1175 (2d Cir.1993)).

facts or had access to information suggesting that their public statements were not accurate ...; or (4) failed to check information they had a duty to monitor....

*Novak*, 216 F.3d at 311 (internal citations omitted). The first method represents the motive and opportunity prong while the remaining three methods relate to conscious misbehavior or recklessness.

 Furthermore, "[t]o establish scienter in misrepresentation cases, facts must be alleged which particularize how and why *each defendant* actually knew, or was reckless in not knowing, that the statements were false at the time made. To establish scienter in omission cases, facts must be alleged which show that *each defendant* knew, or was reckless in not knowing, the information the plaintiff alleges the defendant failed to disclose." *Silva Run Worldwide Ltd. v. Bear Stearns & Co., Inc.*, No. 96 Civ. 5102, 2000 WL 1672324, at *4 (S.D.N.Y. Nov.6, 2000) (emphasis added, citations omitted).

#### a. Motive and Opportunity

 Motive entails concrete benefits that could be realized as a result of one or more of the alleged false statement or omissions. Opportunity entails the means and likely prospect of achieving concrete benefits by the means alleged. *See Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1130 (2d Cir.1994). For example, the pleading of motive and opportunity is sufficient when a plaintiff alleges that corporate insiders made materially misleading statements while selling off large amounts of stock at artificially high prices. *See Novak*, 216 F.3d at 308. Here, plaintiffs do not allege any insider sales. In addition, the benefit alleged must be one that will accrue to the individual defendants; general benefits to the corporation will not suffice. *See id.* at 307 (stating that allega-

tions must "entail concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged"). In addition, as cautioned by the Second Circuit, plaintiffs cannot proceed based on motives possessed by virtually all corporate officers and directors, including:

> (1) the desire to maintain a high corporate credit rating, or otherwise sustain the appearance of corporate profitability, or of the success of an investment; (2) and the desire to maintain a high stock price in order to increase executive compensation, or prolong the benefits of holding corporate office.

*Id.* (internal quotation marks and citations omitted).

 With regard to motive, plaintiffs allege that the Individual Defendants sought to: (1) keep the price of the Company's ADSs high in order to consummate acquisitions using the ADSs as consideration for the exchange; and (2) conceal embarrassing facts and adverse information in order to obtain and retain advertising clients. The second motive is not sufficiently particularized, as any for-profit corporation seeks to enhance its revenue. Accordingly, it cannot support an allegation of scienter. *See Chill v. General Elec. Co.*, 101 F.3d 263, 268 (2d Cir.1996) (stating that generalized motive to justify investment and have it appear profitable, "one which could be imputed to any publicly-owned, for-profit endeavor, is not sufficiently concrete for purposes of inferring scienter").

 The allegation regarding corporate acquisitions is somewhat more complicated. In some circumstances, the artificial inflation of stock price in the acquisition context may be sufficient to satisfy the motive prong of scienter. *See In re Time Warner Inc. Sec. Litig.*,

9 F.3d 259, 270 (2d Cir.1993); *Kalnit v. Eichler,* 264 F.3d 131, 141 (2d Cir.2001) ("[T]his Court has ruled that stock price manipulation in the acquisition context may be sufficient to establish scienter, and has rejected the proposition that 'the desire to consummate any corporate transaction cannot ever be a motive for securities fraud.'") (quoting *Rothman,* 220 F.3d at 93–94). Whether sufficient motive can be shown by an allegation of an artificially high stock price in the context of one impending acquisition depends on the particular circumstances of the case. *See Rothman,* 220 F.3d at 94.

 Plaintiffs allege that in October 2000, the Rediff Defendants sought to acquire ThinkIndia.com and initially proposed a stock-for-stock exchange. *See* CAC ¶ 135. It would have been in their best interests to keep the price of Rediff ADSs high in light of this proposed exchange. In February 2001, however, it was publicly disclosed that the contemplated exchange was to be a cash-for-stock deal whereby Rediff would pay three million dollars in cash for ThinkIndia.com. *See id.* ¶¶ 136–137. There is, therefore, a five-month window (October 2000 to February 2001) in which the Rediff Defendants may have been motivated to keep the price of the ADSs high in order to use them in acquisitions. During this time, the Rediff Defendants allegedly omitted material facts in earnings announcements and press releases.[20] *See infra* Part I.E.

 Whether the proposed stock-based acquisition of ThinkIndia.com can establish motive on the part of Rediff is a question of fact that cannot be decided on a motion to dismiss.[21] *See, e.g., Rothman,* 220 F.3d at 94 ("Whether sufficient motive could be shown solely by an allegation of a high stock price artificially maintained in the context [of] one impending acquisition might well depend on the particular circumstances of the case...."); *In re Complete Mgmt. Inc. Sec. Litig.,* 153 F.Supp.2d 314, 327–28 (S.D.N.Y.2001) (stating that whether the desire to maintain an inflated stock price for acquisition purposes can establish scienter is a "highly fact-intensive" analysis). Plaintiffs, however, have not adequately alleged motive as to the Individual Defendants. Although Balakrishnan and Li are both alleged to have held Rediff stock, neither is alleged to have sold any stock. In the absence of such sales, the proposed acquisition of ThinkIndia.com, by itself, is insufficient to establish motive on the part of the Individual Defendants. *See In re IPO Sec. Litig.,* 241 F.Supp.2d at 364 ("The Second Circuit has explained that motive is properly alleged by stating 'concrete benefits that could be realized by one or more of the

**20.** Plaintiffs' Fifth and Ninth Claims cannot be dismissed as to defendant Gupta because he did not sign the Registration Statement or other documents filed by Rediff with the SEC. These claims are based on post-IPO omissions. *See* CAC ¶ 198 ("This claim is based upon materially false and misleading statements and omissions of material fact made by Rediff and the Individual Defendants during the Class Period."); ¶ 228 ("In addition to the duties of full disclosure imposed on the Rediff defendants as a result of the Registration Statement ... such defendants had a duty promptly to disseminate truthful information that would be material to investors in compli-

ance with the integrated disclosure provisions of the SEC....").

**21.** Although the Complaint states that the "Individual Defendants engaged in such a scheme and course of conduct to inflate the price of the Company's ADSs in order to ... consummate acquisitions using Rediff ADS[s] as currency ....," the benefits of stock-based acquisitions using artificially inflated stock generally inures to the acquiring corporation, but cannot necessarily be imputed to the acquiring corporation's shareholders.

false statements and wrongful nondisclosures alleged.'") (quoting *Ganino*, 228 F.3d at 170).

### b. Conscious Misbehavior or Recklessness

Plaintiffs have also pled circumstantial evidence of conscious misbehavior or recklessness. Facts demonstrating strong circumstantial evidence of conscious misbehavior or recklessness are sufficient to establish scienter. *See Novak*, 216 F.3d at 308. "Where motive is not apparent, it is still possible to plead scienter by identifying circumstances indicating conscious behavior by the defendants, though the strength of the circumstantial allegations must be correspondingly greater." *Kalnit*, 264 F.3d at 142 (internal quotation marks and citation omitted). To survive dismissal under the "conscious misbehavior" theory, plaintiffs must show conduct by defendants that is "'at the least highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'" *Id.* (quoting *Honeyman v. Hoyt (In re Carter–Wallace, Inc. Sec. Litig.)*, 220 F.3d 36, 39 (2d Cir.2000)). This is an intensively fact-based inquiry.

Here, the alleged omissions concerned issues relating to the day-to-day operations of Rediff. Management, including Rediff's officers and directors, must have known about the expiration of Rediff's advertising contracts and its e-mail problems. It is indisputable that Li knew he did not graduate from Stanford University with a degree in computer engineering. Because the omissions and the misrepresentation regarding Li were well within management's purview, their knowl-edge of the true facts cannot credibly be contested. Given this knowledge, their failure to disclose the expiration date of a majority of advertising contracts and Rediff's e-mail problems, as well as their failure to correct the misstatement concerning Li's degree, can be viewed as conscious misbehavior. Because plaintiffs have adequately alleged scienter, the Rediff Defendants' motion to dismiss the section 10(b) and Rule 10b–5 claims cannot be granted on this basis.

### 2. Causation

To maintain a claim for securities fraud under section 10(b) and Rule 10b–5, a plaintiff must plead both "transaction causation" and "loss causation." *See Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171, 186 (2d Cir.2001). *See also Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.*, 343 F.3d 189, 196 (2d Cir.2003) ("To prevail on its federal securities fraud claims, appellant must demonstrate that its injuries were caused by defendants' omission of material information."). The Second Circuit has explained these two aspects of causation as follows:

Like reliance, transaction causation refers to the causal link between the defendant's misconduct and the plaintiff's decision to buy or sell securities. It is established simply by showing that, but for the claimed misrepresentations or omissions, the plaintiff would not have entered into the detrimental securities transaction.

Loss causation, by contrast, is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff. We have often compared loss causation to the tort law concept of proximate cause, meaning that the damages suffered by plaintiff must be a foreseeable consequence of any misrepresentation or material omission.

*Id.* at 197 (internal quotation marks and citation omitted).

■ Defendants argue that plaintiffs have failed to plead loss causation because the decline in stock price following the disclosing events that occurred in early 2001 [22] pales in comparison to the decline which occurred beforehand, in the seven months following the IPO. *Compare* CAC ¶ 28 (price was $19.31 on the day of the IPO) *with* ¶ 103 (price on January 17, 2001 was $3.88). What defendants overlook is that the price of Rediff's ADSs continued to decline once the disclosing events came to pass. For example, after the February 15, 2001 disclosure, Rediff's ADSs dropped almost fifteen percent. *See id.* ¶ 106. Following the March 22, 2001 disclosure, the ADSs declined by another 4.35 percent to a new low of $2.00. Following the August 14th disclosure, the ADSs steadily declined from a closing price of $1.20 on August 13, 2001, to $0.76 on August 20, 2001. Finally, after the disclosure of the pendency of criminal proceedings on November 14, 2001, the price of the Company's ADSs continued to decline and closed at $0.68 on November 15, 2001. *See id.* ¶¶ 118–119.

The fact that the larger price decline in the ADSs occurred before any disclosing event took place does not negate the causal link between the disclosing events and the subsequent decline in stock price. In fact, given the IPO allegations, it is reasonable to assume that the effects of any artificial inflation would dissipate over time. As stated in connection with the consolidated IPO action, inflated stock prices can lead to losses in the following ways:

*First,* there can be an external correction to the market, such as a corrective disclosure. Once the fraud is revealed, it no longer taints the stock price and the artificial inflation disappears. The result is a sale at true value, causing a loss based on the inflated price at the time of purchase. *Second,* there can be a market correction, where ordinary market forces affect the rate of artificial inflation. If, for example, the normal functioning of the securities market causes the inflationary effect to dissipate over time, a customer who buys and sells at inflated prices will still suffer a loss based on the inflated price at the time of purchase so long as the price was less inflated at the time of sale.

*In re IPO Sec. Litig.*, 297 F.Supp.2d 668, 673 (S.D.N.Y.2003). Thus, it is perfectly rational to assume that most of the price decline occurred because of the dissipating effects of the artificial inflation caused by the market manipulation in the aftermarket of Rediff's IPO. This does not mean that the additional, subsequent declines were not caused by other events, namely, the disclosing events described above. Accordingly, plaintiff's non-IPO allegations cannot be dismissed for failure to adequately plead loss causation.

### E. Section 20(a) Control Person Liability

Although the section 15 control person claims have been dismissed, the section 20(a) claim is different. Plaintiffs may not succeed on their section 10(b) and Rule 10b–5 claims against all of the Individual Defendants. If those claims fail with respect to some of the Individual Defendants, but survive with respect to Rediff,

---

**22.** The first such disclosure occurred on February 15, 2001. *See* CAC ¶ 106 (disclosing the peculiar problem with Rediff's e-mail system). Subsequent disclosures occurred on March 22, 2001, *see id.* ¶¶ 107–108 (regarding Li's educational background and the decline in revenue), April 3, 2001, *see id.* ¶ 114 (regarding Li's educational background) and August 14, 2001, *see id.* ¶¶ 115–116 (relating to advertising revenues).

the Individual Defendants who would otherwise be dismissed on the section 10(b) and Rule 10b–5 claims could still be found liable under section 20(a) as controlling persons. Accordingly, defendants' motion to dismiss the section 20(a) claim is denied.

### F. Plaintiffs' IPO Allegations

Plaintiffs bring six IPO claims involving, *inter alia,* "laddering"[23] and Undisclosed Compensation. *First,* plaintiffs claim that both the Underwriter Defendants and Rediff Defendants violated section 11 of the Securities Act by including untrue statements and omitting statements of material fact in connection with "laddering" and Undisclosed Compensation in Rediff's Registration Statement. *Second,* plaintiffs seek to hold the Individual Defendants liable as controlling persons under section 15 of the Securities Act for these misstatements and omissions. *Third,* the Underwriter Defendants are sued under section 10(b) and Rule 10b–5 for deceptive and manipulative practices relating to "laddering" and Undisclosed Compensation. *Fourth,* the Underwriter Defendants are sued under section 10(b) and Rule 10b–5 for materially false and misleading statements and omissions of material facts relating to "laddering" and Undisclosed Compensation. *Fifth,* the Rediff Defendants are sued under the same provisions for similar misstatements and omissions. *Finally,* the Individual Defendants are sued as controlling persons under section 20(a) of the Exchange Act based upon the same misstatements and omissions. Collectively, these claims are referred to as the "IPO Allegations."

### 1. The Underwriter Defendants

The Underwriter Defendants argue that plaintiffs' IPO allegations against them should be dismissed because of differences in language between the Consolidated Amended Complaint and the Corrected Master Allegations ("Master Allegations" or "MA"). The Master Allegations, which adequately allege a fraudulent scheme to inflate the prices of the securities at issue, contain the following representative allegation:

> One customer, in order to obtain shares of the Cacheflow IPO from Morgan Stanley, was required or induced to and did purchase from Morgan Stanley in the aftermarket, at prices substantially above the IPO price, thousands of additional Cacheflow shares.

MA ¶ 34. The Underwriter Defendants argue that the Rediff plaintiffs' "one customer" allegation, which is set forth below, is not the equivalent of the "laddering" allegations just quoted from paragraph 34 of the Master Allegations.

> Customers of each of the Underwriter Defendants, as a condition to obtaining an allocation of ADSs in the IPO, were required or induced to enter into Tie-in Agreements and/or pay Undisclosed Compensation. In order to receive an allocation of over 1000 ADSs from Goldman Sachs, one customer was required to pay excessive commissions amounting to $1.00 per ADS payable upon subsequent transactions in Rediff's ADSs.

CAC ¶ 30. According to the Underwriter Defendants, this allegation is deficient because it does not recite any "aftermarket purchase" but instead uses the term "subsequent transactions." Moreover, plaintiffs' allegation does not mention the size of any subsequent transactions or refer to the price of any subsequent transactions relative to the IPO price.

---

**23.** "Laddering" refers to the Underwriter Defendants' alleged practice of requiring their customers to agree to purchase an issuer's ADSs in the aftermarket at prearranged, escalating prices pursuant to Tie-in Agreements. *See* CAC ¶ 5(a).

While it is true that the language used by plaintiffs in the CAC does not precisely track the language found in paragraph 34 of the Master Allegations, the differences are trivial. Paragraph 30 of plaintiffs' Complaint specifically refers to Tie-in Agreements and Undisclosed Compensation. Those terms are defined earlier in the Complaint. The term "Tie-in Agreements" is defined in paragraph 5(a), which states: "The Underwriter Defendants created artificial demand for the Issuer's ADSs by conditioning allocations in the IPO upon the requirement that customers agree to the purchase of the Issuer's ADSs in the aftermarket and, in some instances, to make those purchases at prearranged, escalating prices ('Tie-in Agreements')." The term "Undisclosed Compensation" is defined in subparagraph (b) of this paragraph as follows:

> As part of the scheme, these underwriters required their customers to repay a material portion of profits obtained from selling IPO share allocations in the aftermarket through one or more of the following types of transactions: (1) paying inflated brokerage commissions; (2) entering into transactions in otherwise unrelated securities for the primary purpose of generating commissions; and/or (3) purchasing equity offerings underwritten by these underwriters, including, but not limited to, secondary (or add-on) offerings that would not be purchased but for the unlawful scheme alleged herein. (Transactions "1" through "3" above will be, at varying times, collectively referred to hereinafter as "Undisclosed Compensation").

CAC ¶ 5(b).

The instant Complaint embraces the spirit, if not the letter, of the Master Allegations. *See, e.g.,* CAC ¶ 41 ("The Registration Statement/Prospectus was materially false and misleading in that in order to receive Issuer's ADS allocations from the Underwriter Defendants in the IPO, customers were required to pay an amount in excess of the IPO price set forth on the cover page in the form of Undisclosed Compensation and/or Tie-in Agreements."); ¶ 43 ("The Underwriter Defendants' scheme was dependent upon customers obtaining substantial profits by selling Issuer's ADS allocations from the IPO and paying a material portion of such profits to Defendants. In this regard, the Underwriter Defendants shared in their customers' profits in violation of NASD Conduct Rule 2330(f).").

The Underwriter Defendants also argue that a commission of $1.00 per ADS is not excessive as plaintiffs' Complaint cites NASD Conduct Rule 2440 which establishes a "5% policy" for mark-ups on most equity securities. Arguably, because Rediff's ADSs traded above $20.00 after the IPO, a commission of $1 per ADS would have been roughly five percent and therefore presumptively fair and reasonable. *See* CAC ¶ 5 ("the price of the Company's ADS' [sic] soared to over $26.00 per ADS within a few days of June 14, 2000"). This argument can be summarily dismissed as plaintiffs point out that under Rule 2440, a mark-up of five percent or even less may be considered unfair or unreasonable where it is based on an inflated offering price or other manipulative conduct.

The Underwriter Defendants make three additional arguments in support of dismissal of plaintiffs' first, third and fourth claims: (1) the Complaint lacks the requisite statement of facts that form the basis of plaintiffs' "information and belief" allegations; (2) the absence of any "zero allocation" allegation; and (3) the exclusion of Rediff's IPO from the statistical analysis found in the Master Allegations. The Underwriter Defendants finally argue that plaintiffs' Complaint fails to plead loss cau-

sation with the heightened specificity required by *Emergent Capital*, 343 F.3d at 198.

■ The first argument is premised on the PSLRA's requirement that for any claim asserting material misstatements or omissions, "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1). The Underwriter Defendants take issue with the third clause of this paragraph, claiming that the Complaint relies on the same sort of introductory statement rejected by this Court in its November 25, 2002 Order. That Order, which was issued in connection with the consolidated IPO action, directed plaintiffs to identify which of their allegations were based on information and belief and to identify, for each of those allegations, the facts on which that belief was formed.

To comply fully with paragraph (b)(1), plaintiffs must file an addendum to their pleadings identifying which paragraphs of the CAC are based on information and belief and the basis for those beliefs. A court has the authority to permit leave to amend pleadings "whenever justice so requires." Fed.R.Civ.P. 15(a). Here, the ends of justice are better served by permitting plaintiffs to supplement their pleadings than by dismissing plaintiffs' claims and granting leave to replead. *See Hotel Constructors, Inc. v. Seagrave Corp.*, 574 F.Supp. 384, 391 (S.D.N.Y.1983) (directing plaintiff to submit a supplement to the complaint in order to meet a pleading standard rather than granting the motion to dismiss).

The Underwriter Defendants next argue that the CAC is deficient because it does not contain a "zero allocation" allegation. Such an allegation, however, is not required. Rather, the "zero allocation" allegation contained in the consolidated IPO action merely reinforced allegations of falsity and scienter already pled against the Non–Allocating Underwriters.

> Plaintiffs have made other allegations that are sufficient to give rise to a strong inference that the Non–Allocating Underwriters signed the registration statement with the requisite state of mind. First, it is significant that these Underwriters were listed on the registration statements as underwriters of the IPO, but then allegedly received no allocation. This circumstance is so unusual that it supports a strong inference that the Non–Allocating Underwriters either knew about, or acted with reckless disregard towards, the entire scheme of the Allocating Underwriters when signing the registration statement. Second, these Complaints cannot and need not be read in isolation. There are 309 Complaints against the fifty-five Underwriters in which Plaintiffs describe in painstaking detail the relationships between the various investment banks. *See* MA ¶¶ 66–85. Even if an Underwriter took no role in one allocation, it took an active role in others—and in those IPOs it is accused of committing illegal acts.

*In re IPO Sec. Litig.*, 241 F.Supp.2d at 361. Because the "zero allocation" allegation does not raise a separate and independent claim, nor is it an element of any other claim, its absence from plaintiffs' Complaint is irrelevant.

The Underwriter Defendants also complain that the Rediff IPO is not included in the statistical analysis offered in the consolidated IPO action. Paragraphs 57–65 of the Corrected Master Allegations are found under the heading "Statistical Anal-

ysis Of The Coordinated Litigation Confirms The Misconduct Alleged Herein." These paragraphs compare various data from the IPOs at issue in the coordinated IPO action with other data from other IPOs during the same time period or from previous years. These paragraphs, and their accompanying charts and graphs, were included for illustrative purposes. The fact that the Rediff IPO was not included in the computation of the statistical data underlying these charts and graphs is of no practical effect given the number of IPOs in issue in the consolidated IPO action.

 Finally, the Underwriter Defendants argue that plaintiffs have failed to allege loss causation. This Court has already considered the effect of *Emergent Capital* on the consolidated IPO action and found that loss causation has been adequately pled. The same reasoning applies here.

> In market manipulation cases, therefore, it may be permissible to infer that the artificial inflation will inevitably dissipate. That being so, plaintiff's allegations of artificial inflation are sufficient to plead loss causation because it is fair to infer that the inflationary effect must inevitably diminish over time. It is that dissipation—and not the inflation itself—that caused plaintiffs' loss.

*In re IPO Sec. Litig.*, 297 F.Supp.2d at 674–75 (footnote omitted). The same loss causation allegations found sufficient in the consolidated IPO action are present in the instant Complaint. *Compare* CAC ¶ 185

("As a result of the manipulative conduct set forth herein, Plaintiffs and other members of the Class acquired, purchased or otherwise [sic] Rediff's ADSs during the Class Period at artificially inflated prices and were damaged thereby.") *and* ¶ 196 ("As a result of the dissemination of materially false and misleading information described above, Plaintiffs and other members of the Class purchased or otherwise acquired Rediff's ADSs during the Class Period without knowledge of the fraud alleged herein at artificially inflated prices and were damaged thereby.") *with* In re Cacheflow, Inc. Consolidated Amended Class Action Complaint ¶ 92 (same) *and* ¶ 103 (same). Accordingly, plaintiffs have adequately pled loss causation with respect to their IPO allegations.

In sum, none of the arguments raised by the Underwriter Defendants justifies dismissing the first,[24] third and fourth claims against them. Accordingly, the Underwriter Defendants' motion to dismiss those claims is denied.

## 2. The Rediff Defendants

The Rediff Defendants seek to dismiss plaintiffs' Fifth Claim, brought under section 10(b) and Rule 10b–5, alleging unlawful "laddering" and Undisclosed Compensation in connection with Rediff's IPO, asserting that the Complaint fails to adequately plead that they acted with the required scienter. To summarize, plaintiffs' allegations of scienter are: (1) "the Underwriter Defendants provided detailed presentations to the Issuer Defendants[25] regarding

---

**24.** Although the Underwriter Defendants note that section 11 claims sounding in fraud must be pled in accordance with Rule 9(b), the requirements of that Rule have been satisfied here. Plaintiffs' Complaint specifically states: the omissions alleged to be fraudulent (the nondisclosure of Undisclosed Compensation and Tie-in Agreements); the persons responsi-

ble for the omissions (the Underwriters); where (in the Registration Statement/Prospectus) and when (June 2000) the omissions were made; and why the omissions were fraudulent (to artificially inflate the market price of the ADSs).

**25.** Presumably, plaintiffs are referring to the Rediff Defendants, which is used later in the

the registration process leading up to the IPO and the expected price performance in aftermarket trading ....";
(2) "the Issuer Defendants worked closely with the Underwriter Defendants in preparing the Registration Statement/Prospectus ...."; (3) "the Individual Defendants and/or other high-ranking Issuer employees worked side by side with representative of the Underwriter Defendants while visiting with several potential investors in a given city on a daily basis over a two to three week period to promote interest in the IPO"; and (4) "the Rediff Defendants also had the motive and opportunity to engage in the wrongful conduct described herein ... because such defendants contemplated the use of Rediff ADS[s] as currency for acquisitions...." CAC ¶¶ 156–158, 160. Through their close interaction with the Underwriter Defendants, the Rediff Defendants allegedly learned of, became aware of, or recklessly disregarded the Underwriter Defendants' misconduct. *See id.* ¶ 159.

### a. Issuer Defendant (Rediff)

 Plaintiffs' allegation that the Rediff Defendants "contemplated the use of Rediff ADS[s] as currency for acquisitions" sufficiently alleges motive on the part of the Issuer Defendant, Rediff. *See In re IPO Sec. Litig.,* 241 F.Supp.2d at 370 (noting that the Evolve Software, Inc. Complaint pled motive on the part of the Issuer Defendant by alleging the announcement of a stock-based acquisition, which may have never actually been consummated, where Evolve would use the alleged inflated value of its shares in the exchange). Accordingly, defendants' motion to dismiss the Fifth Claim against Rediff is denied.

### b. Individual Defendants

Here, as in the consolidated IPO action, there is not a single allegation that any of the Individual Defendants actually knew about the Underwriter Defendants' alleged fraudulent scheme. *See In re IPO Sec. Litig.,* 241 F.Supp.2d at 363. Furthermore, plaintiffs' allegations concerning the interaction between the Individual Defendants and the Underwriter Defendants were found to be insufficient, standing alone, to support an allegation of scienter against the Individual Defendants in the consolidated IPO action.

The Complaints allege, and Plaintiffs argue, that because the Individual Defendants attended the road shows and interacted with the Underwriters prior to the IPOs, there is strong circumstantial evidence of conscious misbehavior or reckless disregard of the truth. The problem with this argument is that it defeats the gatekeeping function of [15 U.S.C. § 78u–4] paragraph (b)(2); were Plaintiffs' argument true, "the executives of virtually every corporation in the United States could be subject to fraud allegations." *Ferber v. Travelers Corp.,* 785 F.Supp. 1101, 1107 (D.Conn. 1991) (cited with approval in *Shields,* 25 F.3d at 1130). Many officers attend road shows and most work closely with the underwriter prior to the IPO. If these facts alone could provide strong circumstantial evidence of conscious misbehavior, then most officers, and all issuers, would be appropriate defendants whenever there is a basis to allege that the registration statements contained a material misrepresentation or omission. If this were the case, the difference between a Section 11 claim and a Rule 10b–5(b) claim would be substantially eroded.

Complaint, as the term "Issuer Defendants" is not defined in the Complaint.

*Id.* at 363 n. 108. This ruling applies here to the Individual Defendants. As in the consolidated IPO action, plaintiffs have not alleged facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness by the Individual Defendants.

 Nonetheless, plaintiffs may still satisfy paragraph (b)(2) of the PSLRA if the Individual Defendants had the motive and opportunity to engage in the fraudulent scheme. To plead motive, plaintiffs must allege " 'concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged.' " *Ganino,* 228 F.3d at 170 (quoting *Shields,* 25 F.3d at 1130). Here, what plaintiffs describe as "laddering" did not benefit the Individual Defendants because they are not alleged to have sold any of their Rediff shares. Plaintiffs do not allege that Rediff's officers and directors received any "Undisclosed Compensation" in connection with the IPO. Nor do plaintiffs allege that Rediff's officers and directors otherwise derived financial benefit from the "laddering" of Rediff's stock prices following its IPO. Although the Individual Defendants may have been motivated to maintain the appearance of profitability, such "attenuated and generalized motives do not satisfy" the requirements of the PSLRA. *In re IPO Sec. Litig.,* 241 F.Supp.2d at 366 n. 11.

Nor can the Individual Defendants be seen as the typical "corporate insiders" who "misrepresent[ ] to the public material facts about the corporation's performance or prospects in order to keep the stock price artificially high while they sold their own shares at a profit." *Novak,* 216 F.3d at 308. *See also In re IPO Sec. Litig.,* 241 F.Supp.2d at 366 n. 110 ("[U]nder *Goldman [v. Belden ]* and *Stevelman [v. Alias Research, Inc.]* a plaintiff may plead motive by alleging that a corporate insider sold significant amounts of personal stock after the allegedly fraudulent misstatement or omission was made."). Here, there were no insider sales of Rediff stock. Because plaintiffs have failed to adequately establish scienter on the part of the Individual Defendants, the section 10(b) and Rule 10b–5 claim (the Fifth Claim) against them is dismissed.[26] However, because this claim remains against Rediff, the Individual Defendants may still be liable as controlling persons under section 20(a). Therefore, the motion to dismiss the Sixth Claim is denied.

## IV. CONCLUSION

For the foregoing reasons, defendants' motion to dismiss is denied in part and granted in part. A conference is scheduled for October 25, 2004, at 3:30 p.m. in Courtroom 15C.

SO ORDERED.

---

**26.** Whether to grant leave to amend lies within the discretion of the district court. *See John Hancock Mut. Life Ins. Co. v. Amerford Int'l Corp.,* 22 F.3d 458, 462 (2d Cir.1994). Here, it appears that plaintiffs alleged all they could concerning the Individual Defendants' scienter with regard to the IPO allegations. Thus, absent a showing by plaintiffs that they could plead new and different facts to support a charge that the Individual Defendants acted with the required scienter, leave to amend is denied. *See Lucente v. International Bus. Mach. Corp.,* 310 F.3d 243, 258 (2d Cir.2002) ("Where it appears that granting leave to amend is unlikely to be productive, however, it is not an abuse of discretion to deny leave to amend.") (internal quotation marks and citation omitted).